IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOMMY ROBINSON,

    Plaintiff,

    v.

UNKNOWN NAME PERSON IN CHARGE,          Civil Action No. DKC-19-2997
    CORIZON HEALTH CARE,
BRENDA REESE,
DR. BERNARD McQUILLAN,
DR. PAUL GOODMAN,

    Defendants.

## MEMORANDUM OPINION

Now pending before the court is a motion to dismiss or for summary judgment filed on behalf of Defendants Corizon Health and Brenda Reese (ECF No. 26); a motion to dismiss or for summary judgment filed on behalf of Dr. Bernard McQuillan (ECF No. 27); and a motion to dismiss or for summary judgment filed on behalf of Dr. Paul Goodman (ECF No. 30). Plaintiff Tommy Robinson opposes the motions. ECF No. 57. No hearing is deemed necessary as the issues have been fully briefed. *See* Local rule 105.6 (D. Md. 2018).

For the reasons set forth below, Defendants' motions, construed as motions for summary judgment, shall be granted. Plaintiff's motions to appoint counsel[1] and for court order are construed as a response in opposition to Defendants' motions to dismiss or for summary judgment and, for reasons stated herein, shall be denied.

---

[1]   Mr. Robinson's earlier-filed motions to appoint counsel (ECF Nos. 12 & 14) were denied by the court on February 5, 2020 (ECF No. 15). The court incorporates the rationale stated therein as the basis for denying Mr. Robinson's currently pending motions to appoint counsel.

BACKGROUND

A.      Complaint Allegations

Plaintiff Tommy Robinson is an inmate confined to Western Correctional Institution ("WCI") in Cumberland, Maryland.   Mr. Robinson describes himself as "a 70 year old handicap[ped] inmate with major health problems" and states that he is going blind and has a back injury that causes him "extreme pain & suffering."  ECF No. 1 at 1.  Mr. Robinson adds that he is confined to a wheelchair and the neck and back pain he suffers is the result of "unlawful beatings by prison guards, police, & death threats by other prisoners that work with prison guards."  *Id.*

He states that on Friday, April 26, 2019, at approximately 1:15 p.m., he was called to the medical units for attendance at the "pain clinic."  ECF No. 1 at 2.  While he waited with twelve other people in the room, Janette Clark and Brenda Reese spoke with Dr. Getachew on the phone while a female correctional officer[2] listened to them discuss Mr. Robinson's private medical problems.  *Id.*  According to Mr. Robinson, Clark and Reese were arguing with Dr. Getachew about an order for "feed-in" Dr. Getachew had issued for Mr. Robinson.  *Id.*  Clark and Reese advocated for stopping the feed-in order, while Dr. Getachew wanted to know why Mr. Robinson's cane had been taken away from him.  *Id.*  Although Dr. Getachew ordered the return of Mr. Robinson's cane, the order was ignored.  *Id.*  Mr. Robinson's prescription for Ultram was renewed for 30 days at this appointment.  *Id.*

In Mr. Robinson's view, discussion of his medical problems within earshot of inmates he did not know and a correctional officer violated his rights under HIPPA.  ECF No. 1 at 2.

---

[2]      Mr. Robinson describes this officer as "a fat white hair female guard" and claims she "stood two feet away from [him] with her hands on her mace can" staring at him for the purpose of intimidating him.  ECF No. 1 at 2.

2

Mr. Robinson states that the "medical department" attempted to terminate his pain medication and his feed-in orders despite the fact that these orders were issued because he has a weak heart.  ECF No. 1 at 2.  He claims that his pain medication was allowed to expire and "no one refill[ed] it on purpose."  *Id*.  He does not state when this occurred or how long he went without pain medication.

On an unspecified date, Mr. Robinson was seen by Dr. Kashaun Temesgen for chronic care.  He states that Brenda Reese was in the examining room "telling the doctor what they wanted him to do . . . and what not to do."  ECF No. 1 at 3.  Mr. Robinson states that when he was seen by Dr. Temesgen for a sick call request, Dr. Temesgen was "cold and forceful."  *Id*.  During this visit, Dr. Temesgen refused to discuss issues regarding restraints used on Mr. Robinson during medical and court trips and renewed Mr. Robinson's prescription for Ultram for 90 days instead of 120 days.  *Id*.  Mr. Robinson states that it took eleven (11) days to begin receiving his pain medication and twenty (20) days later the medication was stopped "by someone."  *Id*.

Mr. Robinson states that after he was "constantly ignored for any pain medication" he was "sent out on a medical trip to Baltimore for tests."  ECF No. 1 at 3.  He claims that he was harassed by transportation officers and that he was mistreated while he was at Jessup Correctional Institution ("JCI").  *Id*.  He states that he was "kept in a dirty cell, with no drinking water" and claims the cell was "filled with ants and roaches."  *Id*.

On July 18, 2019, Mr. Robinson was seen by Dr. Porter at University of Maryland hospital ("UMMS") for an electromyography or EMG.[3]  ECF No. 1 at 3-4.  The test determined that Mr.

---

[3]    An electromyography or EMG "measures muscle response or electrical activity in response to a nerve's stimulation of the muscle."  The test helps "to detect the presence, location, and extent of diseases that damage the nerves and muscles."  *See* https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg (last viewed July 31, 2020).

Robinson has "a severe axonal sensorimotor neuropathy with a super imposed lumber polyradiculopathy." *Id.* at 4.

When Mr. Robinson returned to WCI, he was seen by Dr. McQuillan.  According to Mr. Robinson, Dr. McQuillan refused to renew his Ultram prescription, stating that he was only allowed to prescribe Elavil, Nortriptyline, or Cymbalta.  ECF No. 1 at 4.  Mr. Robinson states that he has taken Elavil in the past (1992, 2000, and 2008) and each time he experienced shortness of breath and was rushed to the hospital.  *Id*.

On September 4, 2019, Mr. Robinson was again seen by Dr. McQuillan, who advised Mr. Robinson that he was renewing all of his medications.  ECF No. 1 at 4.  Mr. Robinson disputes that all his medications were renewed claiming that his "life saving heart medications" were allowed to expire "with other medications."  *Id*.  According to Mr. Robinson, "many of his medications" have been withheld from him because Dr. McQuillan, along with the WCI medical department, is trying to kill him.  *Id*.

In a supplemental complaint filed on November 21, 2019, in response to this court's Order directing him to supplement (ECF No. 2), Mr. Robinson provides a description of his medical complaints.  He states that he has "extreme pain" in his cervical, thoracic, and lumbar spine; right hip pain, bilateral knee and foot pain, and chest pain.  ECF No. 4 at 2.  He adds that his vision is impaired due to floaters, cataracts, glaucoma, and burning in his eyes.  *Id*.  He states that he needs a new wheelchair, diabetic shoes, and surgery for his eye.  *Id*.  Mr. Robinson claims that he sought medical care through use of the "sick call slip process" from 2018 to November of 2019, to no avail.  *Id*.  He concludes that he has "not received proper medical care or strong pain medication" and seeks intervention on his behalf to obtain the care he needs.  *Id*.

In an administrative remedy procedure ("ARP") complaint dated March 19, 2019, Mr. Robinson states that he has been denied surgery that was requested by Dr. Summerville to improve his eyesight.  ECF No. 4-3 at 1-2.  He claims that Dr. Summerville recommended removal of his cataracts and an eye lift to remove extra skin that is preventing him from fully opening his eyes. *Id*. at 2.  He states that he was told this surgery was denied by Wexford.  *Id*.  Mr. Robinson explains that he began seeing Dr. Paul Goodman two years prior to the ARP date and Dr. Goodman has refused to refer him for surgery.  *Id*.  He claims Dr. Goodman simply tells him to try another pair of glasses, but the eight different pairs of glasses ordered for Mr. Robinson have failed to correct his vision.  *Id*.  Mr. Robinson states that as a result of the ineffective treatment he is provided, he cannot see well enough to keep from injuring himself; he has suffered headaches; has fallen in the shower; and has hit his head on a concrete wall he did not see.  *Id*.  He states that Dr. Goodman is rude to him, won't answer his questions, refuses to remove his cataracts, and will not refer him to another doctor who will perform the surgery he believes he needs.  *Id*.  The response to Mr. Robinson's ARP indicates that he was evaluated by the ophthalmologist on March 13, 2019, who noted that Mr. Robinson has "a chronic, symptomatic floater;" that his glaucoma is well controlled, and his cataract is mild.  *Id*. at 4.  Additionally, the response notes that Mr. Robinson received a pair of glasses on April 26, 2018, and that he signed a receipt indicating the glasses were in good condition, he could see clearly out of his glasses, and they were properly fitted.  *Id*.

In an ARP dated August 15, 2019, Mr. Robinson again complains about the lack of care he is receiving for his eyesight.  ECF No. 4-4.  He states that he received a pair of glasses on July 1, 2019, but had not received the magnifying glass that was also ordered for him.  *Id*. at 1-2.  The topic of his ARP quickly changes to a complaint that he developed a virus in his eyes during the first week of August 2019.  *Id*. at 2.  He claims that a nurse referred him to see "Mr. Brooks and

get [his] eyes checked." *Id.*  On August 9, 2019, Mr. Robinson reported to medical to see the eye doctor, but was stopped by the assistant, "who refuse[d] to let [him] see Mr. Brooks." *Id.*  The assistant told Mr. Robinson that eye medication and the magnifying glass were being ordered for him but would not let Mr. Robinson have the "white bumps" on his eyelids checked. *Id.*  He reiterated that his vision is blurry and demanded to see a dermatologist to have the bumps cut off his eyelids. *Id.*  Mr. Robinson also alleged that the denial of these services, including the surgery he maintains he needs, is discriminatory because white inmates have received the cataract surgery he needs. *Id.*  The response to this ARP indicates that Mr. Robinson was evaluated by a nurse on August 8, 2019, regarding his pain and a cough; nothing was mentioned about an issue with his eyes. *Id.* at 3.

Mr. Robinson's September 26, 2019 ARP regarding Dr. McQuillan allowing his "life saving medication" to expire was found meritorious in part.  ECF No. 4-10 at 1-2.  Mr. Robinson's prescription for Isosorbide had been expired since July 25, 2019, and an order for Nitroglycerin was not renewed at Mr. Robinson's chronic care appointment on September 4, 2019. *Id.* at 2.  The ARP response notes, however, that Mr. Robinson did not have "clinical angina pectoris" at the time of his appointment. *Id.*  The Warden contacted the "onsite scheduler" to have Mr. Robinson seen as he was referred to a provider during his last nurse sick call appointment but had not yet been seen. *Id.*

In an ARP dated November 14, 2019, Mr. Robinson complains that although he was prescribed Ultram to manage his pain, he was not given the medication.  ECF No. 4-12 at 1-2.  He states that he has "severe neck & back injuries of 5 disc bulge/protrusions in my neck, 1 disc bulge/protrusion in my middle back & 6 disc bulge/protrusions in my lower back with 4mm Grade 1 Spondylolisthesis of L5 on S1." *Id.* at 1.  He states that the pain he experiences is crippling. *Id.*

at 2.  Mr. Robinson then begins to complain about the cost and the quality of copies of his medical records that he requested.  *Id*. at 2.  He adds that he requested a copy of Dr. McQuillan's report from an October 18, 2019, appointment so that he could "get my Ultram pain medication" but was denied.  *Id*.  There is no substantive response to this ARP as it was rejected with instructions to resubmit the ARP with a copy of the denial.  *Id*. at 1.

In a second supplemental complaint, Mr. Robinson asserts that he is being denied "services, aids, or benefits" because of his race in violation of "Title VI."  ECF No. 12 at 1-2.  He asserts that he is denied "proper pain medication" and a wheelchair; services that are provided to other inmates who are not "Hispanic with brown skin."  *Id*. at 2.  He claims other inmates are provided "superior medical treatment, pain medication, eye operations, new wheelchairs, & medications to keep them healthy while I am denied the same treatment daily."  *Id*. at 2.

He also claims his right hip was injured when he was dropped by hospital staff at Sacred Heart Hospital while he was "sedated during a heart operation."  ECF No. 12 at 3.  According to Mr. Robinson, his hip injury is being covered up and medical staff refuse to give him an MRI of the hip to determine what is causing the pain.  *Id*.  He claims he cannot sleep on his right side or "sit on my right side over 10 minutes" because the pain is so severe.  *Id*.  He admits, however, that Dr. Getachew ordered an MRI of his right hip on May 20, 2018, but claims that Brenda Reese "refuses to allow any [of] the doctors that work under her to order a MRI for me."  *Id*.

Mr. Robinson states that "White Inmates are not allowed to suffer or complain of blurry vision, re-use old wheelchairs, & any other health care problems because they are being taken care of first at WCI."  *Id*.

On December 17, 2019, Dr. McQuillan tried to send Mr. Robinson to physical therapy as recommended by "a doctor at Bon Secures (sic)" but Mr. Robinson declined the appointment

because he was in too much pain to do physical therapy.  ECF No. 12 at 3.  He states that he did not refuse physical therapy; rather, he needs pain medication to be able to do the exercises.  *Id*. at 3-4.

Mr. Robinson complains that Dr. McQuillan has refused to fill out renewal forms for his wheelchair that are required annually and also refused to renew orders for a gel mattress.  ECF No. 12 at 4.  He states that when he asked Dr. McQuillan to renew his Ultram 200 mg, Dr. McQuillan told him that he did not stop the prescription.  *Id*.  According to Mr. Robinson, Dr. McQuillan allowed the prescription to expire.  *Id*.

As relief, Mr. Robinson seeks an Order from this court mandating stronger pain medication, an MRI of his right hip with surgery if indicated, a new wheelchair, and a new pair of orthopedic shoes or boots for his neuropathy.  ECF No. 4 at 3.  In addition, Mr. Robinson wants this court to verify whether Wexford and Corizon are licensed to operate in the State of Maryland and to order his release from prison so he could obtain treatment in an outside hospital.  *Id*.

B.     Defendants' Response

1.     Corizon Health, Inc. ("Corizon") and Brenda Reese, R.N. (ECF No. 26)

Ms. Reese is the director of nursing at WCI and, as a registered nurse, she does not have the authority to dictate the course of any patient's medical treatment.  ECF No. 26-4 at 1-2, ¶¶ 2 and 4.  Ms. Reese attended an April 26, 2019, meeting to review and formulate a plan for Mr. Robinson's medical care including pain management.  *Id*. at 2, ¶5.  She states that the meeting was also attended by the Warden, a doctor, a psychologist, a psychiatry nurse, a psychiatrist, a clinical pharmacist, a nurse practitioner, and the Regional Medical Director.  *Id*.  During the meeting it was agreed that Mr. Robinson would be provided with a cane, crutches, a walker, and wheelchair with a pusher.  *Id*.  Because Mr. Robinson was being provided with a wheelchair for longer

distances, an order for delivery of meals to him in his cell ("feed-in") was felt to be unwarranted. *Id*. Those in attendance at the meeting also agreed to continue Mr. Robinson's prescription for Ultram until he could be seen by a neurosurgeon. *Id*. Mr. Robinson was referred to be seen by a neurosurgeon. *Id*.

Ms. Reese denies attending a June 11, 2019 appointment Mr. Robinson had with Dr. Kashaun Temesgen. ECF No. 26-4 at 3, ¶ 6. Dr. Temesgen saw Mr. Robinson for chronic care clinic for treatment of his diabetes mellitus, hypertension, and chronic pain in his throat, neck, knee, and hip. *Id*. At this appointment Dr. Temesgen renewed Mr. Robinson's medications including Ultram and ordered a low-sodium diet as well as a follow-up chronic care appointment in one month. *Id*.

Ms. Reese adds that Mr. Robinson "has a current lay-in for a wheelchair" and that she does not have the authority to issue orders for lay-ins or special accommodations. ECF No. 26-4 at 4, ¶ 7. She further denies Mr. Robinson's allegation that she "refused to allow doctors to order an MRI" as she does not have authority to do so. *Id*. at ¶ 8. Ms. Reese also denies disregarding, delaying, or otherwise ignoring any of Mr. Robinson's medical needs or treatments. *Id*. at ¶ 9.

2.     Dr. Bernard McQuillan (ECF No. 27)

Dr. McQuillan asserts that Mr. Robinson's complaint simply disagrees with the treatment he is being provided and has not stated an Eighth Amendment claim.

Dr. McQuillan is a cardiologist licensed by the State of Maryland who works as a subcontractor for Corizon Health, Inc. at WCI. ECF No. 27-2 at 1, ¶2. He describes Mr. Robinson as a 70-year-old man with a history of obesity, sleep apnea, hearing loss, hypertension, diabetes mellitus, irritable bowel syndrome, hyperlipidemia, benign prostatic hyperplasia, chronic

obstructive pulmonary disease (COPD), asthma, and chronic pain of his neck, back, and hip. *Id.* at 2, ¶ 5. Dr. McQuillan provides the following summary of Mr. Robinson's medical care.

On January 7, 2019, Dr. Getachew saw Mr. Robinson in the chronic care clinic for his chronic pain, hypertension, and other issues. ECF No. 27-2 at 3, ¶ 6. Mr. Robinson's MRI of his lumbar spine showed "multilevel degenerative spondylosis (a general term for age-related wear and tear of the discs of the lumbar spine) with multilevel disc bulge, protrusion with variable degrees of central and neural foraminal encroachment, and grade 1 anterior spondylolysis of L5-S1." *Id.* The MRI of Mr. Robinson's neck showed multilevel degenerative spondylosis with multilevel small disk protrusion. *Id.* Mr. Robinson did not report an issue with bowel or bladder incontinence, a possible sign of spinal cord injury. *Id.* Dr. Getachew noted that Mr. Robinson had a cane that he used, ordered a walker that Mr. Robinson requested, and renewed his prescription for Ultram. *Id.*

On January 11, 2019, Mr. Robinson underwent an x-ray of his right hip which revealed mild degenerative changes with no acute bone abnormality. ECF No. 27-2 at 3, ¶7. Dr. McQuillan states that Mr. Robinson's assertion that he needs an MRI to assess his need for hip surgery is not medically indicated given that his x-ray does not show significant degenerative changes or a hip fracture. *Id.* In Dr. McQuillan's opinion, Mr. Robinson's hip complaints stem from his lumbar spine issues and he is undergoing treatment for that condition. *Id.*

Mr. Robinson was evaluated for physical therapy on January 17, 2019, and underwent physical therapy sessions on January 21, 23, 28, and 30, 2019 and February 3, 6, 11 and 13, 2019. ECF No. 27-2 at 3-4, ¶¶ 8, 9, 11, & 13.

On February 7, 2019, Dr. Getachew saw Mr. Robinson for chronic care evaluation. ECF No. 27-2 at 4, ¶ 12. At this appointment Dr. Getachew stopped Mr. Robinson's Glucophage as his

diabetes was well-controlled.  *Id*.  Mr. Robinson exhibited a 3/5 weakness in his lower extremities and a 4/5 weakness in his upper extremities.  *Id*.  Dr. Getachew continued the Ultram prescription, referred Mr. Robinson for a neurosurgery evaluation, approved a wheelchair for long-distance, and provided a "lay-in for crutches."  *Id*.

On April 17, 2019, Mr. Robinson was evaluated by a neurosurgeon for his reports of persistent neck and back pain, lower extremity weakness since 1991, and progressive lower extremity weakness since the early 2000s.  ECF No. 27-2 at 5, ¶ 15.  The neurosurgeon reviewed Mr. Robinson's MRIs, noted some lumbar abnormalities but noted that the cervical spine MRI was "unremarkable."  *Id*.  It was the neurosurgeon's opinion that Mr. Robinson's cervical spine was not the likely cause of his bilateral hand numbness and pain.  *Id*.  The neurosurgeon recommended a CT scan of Mr. Robinson's cervical, thoracic, and lumbar spine; an x-ray of the lumbar spine; an electromyogram and nerve conduction study of both upper and lower extremities; an MRI of the thoracic spine; a trial of Medrol (a steroid); and further evaluation after testing is completed. *Id*.  The April 26, 2019, meeting described by Brenda Reese occurred after Mr. Robinson was seen by the neurosurgeon.

On May 3, 2019, Dr. Getachew requested an MRI of Mr. Robinson's thoracic spine, an electromyogram and nerve conduction study (EMG/NCS), and a CT scan of his cervical, thoracic, and lumbar spine.  ECF No. 27-2 at 6, ¶17.

On May 10, 2019, Mr. Robinson's lumbar spine was x-rayed and revealed lumbar spondylosis.  *Id*. at ¶18.

On May 23, 2019, Mr. Robinson underwent CT scans of his cervical, thoracic, and lumbar spine.  ECF No. 27-2 at 6, ¶ 19.  The CT of his cervical and thoracic spine showed "mild multilevel intervertebral disc space narrowing and osteophytes."  *Id*.  The CT of his lumbar spine showed

11

"mild intervertebral disc space narrowing and osteophytosis, vacuum disc phenomenon (an accumulation of gas within the crevices of the intervertebral discs which may be a byproduct of disc degeneration) at L2-L3, L3-L4, L5-S1, bilateral L5 pars interarticularis defects with minimal Grade 1 anterolisthesis (a condition characterized by the forward positioning of one spinal vertebra in relation to the adjacent vertebra beneath it) of L5 and S1, and degenerative changes of bilateral sacroiliac joints." *Id*.

Mr. Robinson's medications were again renewed by Dr. Temesgen on June 11, 2019, when he saw Mr. Robinson in chronic care. ECF No. 27-2 at 7, ¶ 20.

On July 18, 2019, Mr. Robinson underwent the EMG/NCS testing of his lower extremities which revealed "severe axonal sensorimotor neuropathy (weakness from nerve damage) with a superimposed lumbar polyradiculopathy from L4-L5." ECF No. 27-2 at 7, ¶ 21.

On July 25, 2019, Dr. McQuillan requested an EMG/NCS for Mr. Robinson because he did not receive the test for his upper extremities on July 18, 2019. *Id*. at ¶ 22.

Dr. McQuillan saw Mr. Robinson on September 4, 2019, for chronic care clinic in connection with his diabetes and cardiac issues. ECF No. 27-2 at 7, ¶ 23. At that time, Mr. Robinson's diabetes was "maintained without diabetes medication." *Id*. For his high blood pressure, Mr. Robinson was taking "hydrochlorothiazide with Coreg." *Id*. Mr. Robinson requested Ultram and Neurontin for his neck, back, and knee pain and told Dr. McQuillan that Naproxen and Tylenol were ineffective. *Id*. Dr. McQuillan observed that Mr. Robinson's "neck was supple and he exhibited no cardiac abnormalities . . . [his] deep tendon reflexes were intact bilaterally." *Id*. Although Dr. McQuillan renewed Mr. Robinson's prescriptions for hydrochlorothiazide, Coreg, Aspirin, fish oil, Tamsulosin, Constulose, and Oran-I Nr, he "declined to prescribe Neurontin and instead prescribed Cymbalta for [his] diabetic neuropathy." *Id*. at 7-8,

12

¶ 23.  Dr. McQuillan also did not renew Mr. Robinson's prescription for nitroglycerin because he had no symptoms of "temporary chest pain or discomfort cause[d] by decreased blood flow to the heart" known as angina pectoris.  *Id*. at 8, ¶ 24.

Dr. McQuillan explains that he did not prescribe Neurontin or Ultram for Mr. Robinson because Ultram is an opioid-like pain medication with complications associated with its long-term use and Neurontin can be misused to achieve a "euphoric and/or sedative effect."  ECF No. 27-2 at 8-9, ¶¶ 25, 27.   Dr. McQuillan further explains that "[w]hile opioid and opioid-like pain medications may be effective analgesics, one of their serious and common side effects is psychological and physical addiction" and, "[t]he longer one uses the opioid medication, the less effective and more dangerous that medication becomes."  *Id*. at 8, ¶ 25.  Dr. McQuillan adds that the correctional setting adds problems with illicit use of these medications or their use in suicide attempts.  *Id*. at 26.  He adds that "[e]ven when the patient does not intend to misuse the prescription the patient may become a target of violence or other manipulation to obtain access to the patient's drugs."  *Id*.  Given the concerns regarding Ultram and Neurontin, Dr. McQuillan did not believe either medication was appropriate for Mr. Robinson and adds that Cymbalta, which he did prescribe, can be "used to treat diabetic neuropathy and chronic muscle or bone pain but is less risky than [Ultram] and Neurontin."  *Id*. at 9, ¶ 28.

On September 10, 2019, Mr. Robinson underwent an MRI of the thoracic spine which showed "mild thoracic kyphosis (abnormal curvature of the spine which can occur with age), mild diffuse degenerative spondylosis, and a small disc bulge at T7-T8."  ECF No. 27-2 at 9, ¶ 29.

On October 9, 2019, Mr. Robinson underwent EMG/NCV testing of both upper and lower extremities which revealed "severe sensory polyneuropathy . . . especially in the lower extremities, which was possibly attributable to diabetes mellitus."  ECF No. 27-2 at 10, ¶ 31.  The test also

supported possible radicular pain from the L4-L5 level of Mr. Robinson's spine. *Id*. The provider suggested Neurontin, an MRI of the lumbar spine, physical therapy, and a neurosurgery evaluation in the event physical therapy failed. *Id*.

On October 18, 2019, Dr. McQuillan saw Mr. Robinson for a physical examination which revealed no kyphosis, scoliosis, or skeletal or joint deformity. ECF No. 27-2 at 10, ¶ 32. Because the neurologist recommended it, Dr. McQuillan prescribed Neurontin and requested physical therapy. *Id*. At Mr. Robinson's request, Dr. McQuillan discontinued Cymbalta. *Id*.

Mr. Robinson received a physical therapy evaluation on October 29, 2019. ECF No. 27-2 at 10, ¶ 33.

When Dr. McQuillan saw Mr. Robinson again on December 17, 2019, he told Dr. McQuillan that the Neurontin was not addressing his pain and that he could not participate in physical therapy unless he was prescribed Ultram for his pain. ECF No. 27-2 at 11, ¶ 35. Dr. McQuillan continued to believe that Ultram was inappropriate for Mr. Robinson, therefore he did not prescribe it. *Id*. Dr. McQuillan felt that Mr. Robinson's neck and hip pain complaints were appropriately addressed through prescriptions for aspirin, Naproxen, and Neurontin. *Id*.

On December 19, 2019, Mr. Robinson's Neurontin prescription was renewed; however, a test performed on the same day showed he had no evidence of Neurontin in his blood stream. ECF No. 27-2 at 11, ¶ 36. On December 29, 2019, Janette Clark, Nurse Practitioner, reviewed the lab results, noted that Neurontin was not detected, and discontinued Mr. Robinson's Neurontin prescription due to "noncompliance and suspected diversion." *Id*. at ¶ 37.

On December 31, 2019, Mr. Robinson was seen by Dr. Cedric Poku-Dankwah in chronic care for a medication refill. ECF No. 27-2 at 11, ¶ 38. Mr. Robinson told Dr. Poku-Dankwah that he stopped taking Neurontin because it was not helping him, explaining the non-detectable levels

14

of the medication in recent lab work.  *Id*. at 12, ¶ 38.  Dr. Poku-Dankwah noted that Mr. Robinson

was in no apparent distress and exhibited no abnormalities of his neck or other musculoskeletal

deformities.  *Id*.

Mr. Robinson was again seen on January 13, 2020, by Dr. Getachew, Dr. McQuillan, Dr.

Maher, and Sue Bryant, RN for an evaluation of his chronic pain management.  ECF No. 27-2 at

12, ¶ 39.  Mr. Robinson reported that his "chronic back pain with weakness and chronic neck pain

. . . were not well-controlled with anti-inflammatory medications and Neurontin."  *Id*.  He

maintained that his pain was well-controlled with Ultram; Dr. Getachew prescribed Ultram

pending a neurosurgery evaluation.  *Id*.  Mr. Robinson's wheelchair order was also renewed.  *Id*.

On January 21, 2020, Mr. Robinson was observed by a nurse wheeling away from the

medication administration line with his Ultram in a cup.  ECF No. 27-2 at 12, ¶40.  Mr. Robinson

was supposed to take the medication at the window but did not do so.  *Id*., *see also* ECF No. 26-5

at 373, 375-76.  A similar occurrence was noted on January 27, 2020, when Mr. Robinson was

provided with Ultram and was instructed to take the medication at the medication administration

window, but again rolled away with the medication still in a cup.  *Id*. at ¶ 41.  This failure to

observe rules regarding the administration of Ultram indicated that Mr. Robinson "diverted the

medication."  *Id*.  The following day, Dr. Getachew discontinued Mr. Robinson's Ultram

prescription based on his diversion and made a request for Mr. Robinson to be scheduled for a

follow-up examination so he could be treated for his pain with non-narcotic medications.  ECF

No. 27-2 at 13, ¶ 42, *see also* ECF No. 26-5 at 376.

On February 15, 2020, Jannette Clark, NP, saw Mr. Robinson in response to a number of

concerns he had raised and for renewal of medication.  ECF No. 27-2 at 13, ¶ 43.  Mr. Robinson

asked for renewal of his Ultram prescription; a new wheelchair; a "feed-in" order and "a pill to

increase his energy." *Id.*, *see also* ECF No. 26-5 at 380 (EPHR).  Clark noted that Mr. Robinson did not need a feed-in order because he had already been provided a wheelchair for traveling distances.  *Id.*  She also noted that the wheelchair Mr. Robinson had did not need to be replaced as it was still functional.  *Id.*  She explained to Mr. Robinson that there was no "magic pill" to restore his energy; rather, he should focus on eating healthy and losing weight.  *Id.*  Although Mr. Robinson told Clark he had the flu, he exhibited no symptoms of the flu.  *Id.*  Mr. Robinson also said he could not stand but stood to have his weight checked.  *Id.*  Clark renewed his prescription for Naproxen at this visit.  *Id.*

Dr. McQuillan adds that Mr. Robinson does not have a medical need for a gel mattress because he is not a paraplegic who is susceptible to skin breakdowns, which is what gel mattresses are meant to address.[4]  ECF No. 27-2 at 14, ¶ 46.  Dr. McQuillan denies basing any of his treatment decisions regarding Mr. Robinson's care on anything other than medical concerns.  *Id.* at ¶ 47.

3.      Dr. Paul Goodman (ECF No. 30)

Dr. Goodman is an ophthalmologist who worked as a locum tenens subcontractor for Corizon Health between January 1, 2019 and October 1, 2019.  ECF No. 30-3 at 1, ¶ 2.  In that capacity, Dr. Goodman provided treatment to Mr. Robinson.  *Id.*  Dr. Goodman addresses each of Mr. Robinson's claims that he requires eye surgery for "burning eyes and blurry eyesight from floaters, cataracts, and glaucoma" as follows.  *Id.* at 2, ¶ 4.

Dr. Goodman explains that floaters are "small flecks of protein which may cause spots in vision" and are generally age-related.  ECF No. 30-3 at 2, ¶ 5.  He adds that floaters can also be caused by cataract surgery and typically do not interfere with sight.  *Id.*  The surgical procedure to

---

[4]      Notwithstanding Dr. McQuillan's opinion regarding his need for a gel mattress, Mr. Robinson was provided one on September 6, 2018 (ECF No. 27-5 at 1) and was provided "paperwork" for a new gel mattress on January 20, 2020.  ECF No. 27-4 at 168.

address floaters, which is called a vitrectomy, involves "removing the vitreous (a gel-like substance) of the eye with an incision and replacing it with a solution." *Id.* at 3, ¶ 5.  The procedure does not always remove floaters and does not guarantee the floaters will not return, "especially if the vitrectomy causes bleeding or trauma." *Id.*  Given the complications, Dr. Goodman states that the surgery is "indicated only for severe symptoms of floaters." *Id.*  In Dr. Goodman's opinion, a vitrectomy is not needed for Mr. Robinson's right eye floater as it does not significantly interfere with his vision and the surgery is risky. *Id.* at 4, ¶ 12.

"A cataract is a clouding of the lens of the eye and can cause blurry vision." ECF No. 30-3 at 3, ¶ 6.  Dr. Goodman explains that cataract surgery is indicated if the cataracts interfere with the patient's activities of daily living because the surgery "carries risks such as floaters, infection, retinal detachment, worsening of glaucoma, secondary cataracts, and loss of vision." *Id.*  Dr. Goodman states that "[i]t was medically appropriate to ascertain whether [Mr. Robinson's] complaints of blurry vision could be resolved with glasses rather than proceeding with a risky and unnecessary surgery for objectively mild cataracts." *Id.* at 5, ¶ 13.

"Glaucoma is a disease that damages the optic nerve of the eye." ECF No. 30-3 at 3, ¶ 7. Dr. Goodman states that glaucoma can be treated with eye drops, which Mr. Robinson is currently receiving, or it may be addressed with surgery in severe cases. *Id.*  Dr. Goodman adds that Mr. Robinson does not need surgery for his glaucoma. *Id.*

On January 29, 2019, Mr. Robinson was seen by an optometrist who noted he had 20/200 vision and intraocular pressure of 20 in both eyes.  ECF No. 30-3 at 3, ¶ 8.

Dr. Goodman saw Mr. Robinson on March 13, 2019 and noted that Mr. Robinsons "primary open-angle glaucoma ('POAG') was well-controlled."  ECF No. 30-3 at 3, ¶ 9.  Mr. Robinson's "nuclear sclerotic cataract ("NSC") was mild" and he "had a large symptomatic floater

in the right eye." *Id*. at 3-4, ¶ 9.  In Dr. Goodman's opinion, Mr. Robinson's report of "blurry vision was attributable to an outdated glasses prescription rather than his mild cataracts." *Id*. at 4. Dr. Goodman referred Mr. Robinson to an optometrist to update his glasses prescription and asked for a follow-up appointment in six-months to determine if the new prescription would help Mr. Robinson's vision without resorting to "risky eye surgery." *Id*.

When Dr. Goodman saw Mr. Robinson again on September 11, 2019, he had not yet been seen for a new glasses prescription.  ECF No. 30-3 at 4, ¶ 10.  Dr. Goodman states that Mr. Robinson's complaints of chronic blurry visual acuity were "inconsistent with his mild cataracts." *Id*.  At this appointment, Dr. Goodman referred Mr. Robinson to an optometrist again "before considering a cataract extraction with intraocular lens implant." *Id*.

On January 11, 2020, an optometrist examined Mr. Robinson and provided him with a prescription for new eyeglasses which were issued on February 12, 2020.  ECF No. 30-3 at 4, ¶ 11.  Currently, Dr. Goodman is not involved in Mr. Robinson's treatment. *Id*. at 5, ¶ 14.  Dr. Goodman denies basing any of his medical decisions regarding Mr. Robinson's care on anything other than "sound medical judgment." *Id*.

C.    Mr. Robinson's Opposition[5]

Mr. Robinson alleges that "Dr. McQuillan was trying to kill me and NOT help me."  ECF No. 57-1 at 38.  He states that he had a stroke in 2008 and his lab report showed he was anemic with extremely low testosterone, which was treated with magnesium and iron, but those supplements were discontinued and he began to feel ill again. *Id*.  He claims that "doctors at

---

[5]    Mr. Robinson's opposition consists of 424 pages of material.  ECF No. 57.  The document does not appear to have been docketed in any particular order and includes correspondence to and from Mr. Robinson, medical records, administrative remedy procedure requests, as well as papers that are responsive to the dispositive motions filed in this case.  Some of the documents are illegible.

Sacred Heart Hospital did tell me that I needed these meds corrected in order to make my heart stronger" and if he did not get them, he "would become weak & slowly die & this is what Dr. McQuillan is trying to do to me." *Id*.

Mr. Robinson complains that the Cymbalta and Neurontin he was prescribed is ineffective and states that Neurontin is not for pain but is for seizures. ECF No. 57-1 at 38. He states that taking Neurontin caused his right leg to become swollen and painful and remains painful now. *Id*. According to Mr. Robinson, Dr. McQuillan prescribed these medications to him as an experiment. *Id*. Mr. Robinson claims that Dr. McQuillan falls asleep during appointments with patients, reads from a paper, and stands up to state very loudly that the appointment is over without allowing time for any questions. *Id*.

Mr. Robinson reiterates that he had a stroke in 2008 and that he was placed on iron and magnesium supplements to make his heart stronger and to improve his life. ECF No. 57-1 at 39-40. Despite promising Mr. Robinson that he would renew all of his medications, Dr. McQuillan did not renew his iron supplements and "purposely allowed" them to expire without explaining anything to Mr. Robinson. *Id*. at 40.

Mr. Robinson disputes that he was seen by Dr. McQuillan on June 8, 2020, and disputes that he was seen by Dr. Getachew on June 12, 2020. ECF No. 57-1 at 41. He states that on June 8, 2020, he was seen by a black male nurse for a temperature check and was later given a COVID 19 test by another nurse. *Id*. On June 12, 2020, Mr. Robinson says he was called for sick call regarding a bleeding rash on his right leg; he was seen by "Nurse Amy" and was provided Lasic to take for four days, but he was never seen by Dr. Getachew on that date. *Id*.

Mr. Robinson denies ever hoarding or selling his medications and claims that his wheelchair, cane, and walker were taken away from him without an evaluation. ECF No. 57-1 at

58.  He continues to seek an examination by a physician, an MRI of his right hip, renewal of his "correct medication," consideration for back and right hip surgery, and transfer to another prison or release to a veteran's hospital.  *Id.*

With regard to an incident occurring on January 21, 2020, Mr. Robinson explains that his pain medication was never prescribed as "watch take."  ECF No. 57-2 at 8.  He states that he was called to the "shack" for his meds at 8:15 pm and it was raining that night.  *Id.*  He had to wait in the rain for his medications for approximately 20 minutes.  *Id.*  When he got to the window where the medications are dispensed he saw two black males and one black female inside the shack passing out medications.  *Id.*  He explains that there is a pile of dirt fourteen inches high pushed up against the wall of the shack and his wheelchair could not get close to the window because of it.  *Id.*  The woman dispensing medications was unwilling to reach out of the window to give him his medications and he was forced to roll his wheelchair up the small hill of dirt to retrieve them. *Id.*  He states that because the wheelchair was unstable, it rolled backward down the hill as soon as he got his medications.  *Id.*  He claims that he took the medication in front of two correctional officers who were standing in front of the window watching each wheelchair inmate.  *Id.*  Mr. Robinson claims that he did nothing wrong and requests security surveillance video to prove it. *Id.* at 9.  The reports that Mr. Robinson improperly "wheeled away" with his medications are, according to him, nothing more than a conspiracy by Corizon employees because he filed a complaint of race discrimination against Corizon and the medical department with the Justice Department.  *Id.*

Mr. Robinson claims that when he was sent to Jessup Correctional Institution on a medical trip on October 8, 2019, he was put into a cell without water.  ECF No. 57-2 at 11.  Despite telling the officer on the tier about the issue, he claims the problem was never solved.  *Id.*  In addition, he

asked for a handicap cell but was told there were none left.  *Id*.  The following day he was sent to Bon Secours Hospital and before he left, he repeated that there was no water in the cell where he was confined (cell A-125).  *Id*.  The inmate in the cell next to the one where Mr. Robinson was held flooded the tier with water because he wanted medical treatment.  *Id*.  By the time Mr. Robinson returned to WCI he states that he was dehydrated and short of breath due to his COPD. *Id*.  He claims that he was sick for the next three days due to the conditions at JCI.[6]  *Id*.

Mr. Robinson also takes umbrage with this court's characterization of him as a "frequent litigator" when he is actually a "seeker of justice" and maintains that this court "allowed the racist attorneys for Wexford to re-name and add innocent persons names to this lawsuit."  ECF No. 57-3 at 9.  He states that Kimberly Martin had nothing to do with this case, but this court added her name as a defendant.[7]  *Id*.  Mr. Robinson also claims that the instant case was erroneously opened as he understood all of his cases would be stayed and when he sent the instant complaint to the court, he thought it would be docketed in an existing, stayed case.  *Id*.  He reiterates that he is blind, is unable to keep up with legal cases, and suffers from such severe pain that he cannot walk or stand.  *Id*.

In a document entitled "Motion to Court for Emergency Investigation and Appointment of Counsel ASAP" Mr. Robinson asserts that there is a conspiracy between medical providers and the undersigned judge to "kill [him] and cover it up, to keep him quiet."  ECF No. 57-4 at 32.  He claims that this court has not done enough to protect his rights and that he has become a victim of racial profiling by the undersigned.  *Id*.  He again claims that Dr. McQuillan is trying to kill him

---

[6]     Mr. Robinson seeks as a remedy that any time he is taken on medical trips he should be confined at the "Cut Hospital and held for each hospital visit to Baltimore."  ECF No. 57-2 at 12. The "Cut" or the Maryland House of Correction has been closed for several years.

[7]     Kimberly Martin is not a defendant in this case.

and is doing so with the help of other medical staff by withholding needed medication.  *Id*. at 35. He cites the termination of his Metformin (Glucophage) in February 2019, without explanation or substitution to treat his diabetes.  *Id*.  He claims again that Dr. McQuillan intentionally allowed his Isosorbide and Nitroglycerin to expire and refused to renew it.  *Id*.

Mr. Robinson maintains that his eyesight, which was above average when he was younger and in the Air Force, can only be improved if the lens in his eye is replaced with a soft clear lens because the lens has hardened making it difficult to focus.  ECF No. 57-4 at 165.  He claims that two White inmates who are younger than Mr. Robinson were approved for eye surgery after complaining once about blurry vision and asserts that this was due to race discrimination.  *Id*. at 165-66, 172.

Mr. Robinson claims the denial of a magnifying glass is "only harassment and discrimination" against him because he does "not need the approval from medical, only for Corizon to pay for it."  *Id*. at 173.  He states that he has a magnifying glass that he has used for five years, but it is now too weak and small to help with his vision.  *Id*.  Mr. Robinson admits that he was allowed to order a magnifying sheet in January of 2020 but claims that it did not "help very much because the print was too small to see clearly."  *Id*. at 198.  He states that his vision is getting worse every day and cannot be corrected with regular glasses or contact lenses.  *Id*. at 199.

STANDARD OF REVIEW

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

22

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 645 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In a motion to appoint counsel filed after Defendants' responded to his complaint, Mr. Robinson seeks to obtain video surveillance of the medication window area for the time he is accused by Bernice Swan of refusing to take his Ultram at the window and asks this court to compare how other inmates receive their medications. ECF No. 32 at 2. To the extent the request may be construed as one seeking discovery pursuant to Fed. R. Civ. P. 56(d), the request shall be denied. Federal Rule of Civil Procedure 56(d) provides that:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts to justify its opposition, the court may:
>
> (1)  Defer considering the motion or deny it;
> (2)  Allow time to obtain affidavits or declarations or to take discovery; or

(3)   Issue any other appropriate order.

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011), *rvs'd on other grounds*, (alteration in original) (citation omitted).  Here, whether other inmates are required to take their medication before leaving the window is not essential to the opposition of the dispositive motions. The delivery of medications to other inmates under various circumstances is not necessarily applicable to Mr. Robinson and has no bearing on the decision to withdraw his Ultram prescription. *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995) (discovery of additional evidence sought for discovery is properly denied if it does not create genuine issue of material fact).

## ANALYSIS

### A.    Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious

24

medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available.  *See Farmer v. Brennan*, 511 U.S. 825, 834-7 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).  Objectively, the medical condition at issue must be serious.  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition.  *See Farmer*, 511 U.S. at 839-40.  Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'"  *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness

requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

      1.     Corizon (Unknown Name Person in Charge)

Mr. Robinson contends that since Corizon has taken over as the medical provider there has been a "conspiracy by the Defendants to do everything possible to kill [him] by refusing to order needed medications that will help keep [him] alive." ECF No. 32 at 3. While the court recognizes that this assertion probably represents Mr. Robinson's sincere belief, he provides no objective facts to support such a conclusion. Even a cursory review of Mr. Robinson's medical records reveals that his multiple concerns are addressed through medication, tests, referrals to specialists, and consultations that include his entire medical treatment team. Moreover, his claim against Corizon fails because a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009).

2.      Brenda Reese, RN

Mr. Robinson claims that Ms. Reese interfered with Dr. Getachew's April 26, 2019, attempt to reinstate a feed-in order for him and that she told Dr. Temesgen what he could and couldn't do for Mr. Robinson during an appointment with him.  Ms. Reese denies these allegations and explains that her role as director of nursing at WCI does not include the authority to dictate a patient's treatment.  She also explains that the April 26, 2019, meeting that she attended was also attended by multiple providers and, because Mr. Robinson was being provided a wheelchair for long distance travel within the prison, a feed-in order was not necessary.  Mr. Robinson offers no evidence to refute Ms. Reese's account.  Ms. Reese is entitled to summary judgment in her favor.

3.      Dr. McQuillan

Mr. Robinson claims that Dr. McQuillan refused to renew his Ultram prescription following his July 18, 2019, trip to UMMS; allowed his heart medications to expire; refused to renew an order for his wheelchair; refused to order an MRI for his right hip; and refused to order new orthopedic shoes.  Dr. McQuillan explains that Mr. Robinson's Ultram prescription was not renewed because of the very real dangers the medication presents in terms of addiction and loss of efficacy as well as the potential for misuse in a correctional setting including patients becoming targets for abuse by other inmates.  Those concerns, which Mr. Robinson does not dispute, are not evidence of a disregard for Mr. Robinson's serious medical need; rather, they are indications that Mr. Robinson's health and well-being are central to the decision not to renew an Ultram prescription.  His insistence that Ultram must be prescribed for him, despite the valid concerns voiced by medical care providers regarding Ultram's addictive qualities and the dangers it poses in a correctional setting, is a disagreement with a medical decision that does not state an Eighth Amendment claim.

The verified medical records submitted by Defendants establish that Mr. Robinson's order for a wheelchair was in fact renewed for another year on February 28, 2020.  ECF No. 37-2 at 9.  When Mr. Robinson returned one-month later requesting a wheelchair, Jannette Clark, NP, noted that the wheelchair Mr. Robinson already had was in working order and did not need to be replaced.  ECF No. 26-5 at 380; ECF No. 27-2 at 13, ¶ 42.  He was advised that if the wheelchair needed repairs he should "follow protocol for having [it] looked at."  ECF No. 26-5 at 380.  Mr. Robinson also does not dispute these assertions and he admits that the needed repairs he cites are not the responsibility of medical care providers.  ECF No. 57-4 at 74, 76.  Rather, repairs on wheelchairs are the responsibility of Sgt. Ferris, a correctional officer at NBCI.  *Id.*

Dr. McQuillan also explains that Mr. Robinson's demand for an MRI and surgery for his right hip is not medically indicated in light of the x-ray results of his hip showing no bone abnormality.  ECF No. 27-2 at 3, ¶ 7.  The Eighth Amendment does not require medical care providers to order unnecessary tests that are demanded by prisoners and Dr. McQuillan's failure to indulge Mr. Robinson's demand does not support an Eighth Amendment claim.

In one of Mr. Robinson's filings, he claims that his legs have swollen up and are painful and blames the "Defendant Doctors" for giving him "medications that do not work as a pain relief, such as Cymbalta and Neurontin."  ECF No. 32 at 4.  He also claims that he took this medication and it did not treat his pain, therefore he stopped taking the medication, told medical staff he stopped taking it, and stopped going to pill call.  *Id.*  He adds that any medical records showing he received these pills are false and claims that Bernice Swan has a habit of marking the sheets before she dispenses the medication.  *Id.*

To the extent that Mr. Robinson is attempting to add a new claim[8] regarding his swollen legs, that attempt must fail.  The court may not address such new claims because an opposition to a dispositive motion is not a vehicle for amending a pleading.  *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015).  Further, permitting Mr. Robinson to amend his claims to include this allegation is prejudicial to the Defendants because it is belated and changes the nature of his claims.  *See Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 604 (4th Cir. 2010).

Assuming Mr. Robinson's allegation regarding Neurontin is true and he did not "divert" his medication, the termination of the Neurontin prescription does not state a claim.  Mr. Robinson is being provided alternative pain medications such as Naproxen.  To the extent that he argues his pain medication is ineffective, evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference.  *Baez v. Falor*, 2012 U.S. Dist. LEXIS 138574, 103,2012 WL 4356768 (W. D. Pa. 2012), citing *Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003); *Rochell v. CMS*, No. 4:05CV268, 2006 U.S. Dist. LEXIS 37943, at 10 (N. D. Miss. April 10, 2006) ("The constitution does not . . . guarantee pain-free medical treatment").

4.    Dr. Goodman

Mr. Robinson's complaints about Dr. Goodman's refusal to perform surgery for his cataracts, floaters, and glaucoma amount to a disagreement in a chosen course of medical care.  Dr. Goodman provides cogent reasons for not providing the surgeries Mr. Robinson insists he

---

[8]    Mr. Robinson also attributes his 2008 stroke to a lack of magnesium and now wants something with magnesium in it and also states that he needs "iron pills."  ECF No. 32 at 3.  He cites to a lab report of January 31, 2019, as evidence that his magnesium and iron is low.  *Id.*  These allegations are also raised for the first time by Mr. Robinson in response to Defendants' motions and will not be addressed here.

requires, including the risks associated with each of those, based upon his examination of Mr. Robinson's eyes.  To the extent that Mr. Robinson's recently issued eyeglasses have not addressed the problem with his visual acuity, the stated plan of care was to revisit other options if Mr. Robinson's eyesight did not improve.  Resort to conservative courses of treatment does not violate the Eighth Amendment.  Dr. Goodman's concerns that eye surgery for one or more of Mr. Robinson's existing problems could exacerbate the issues with his vision is evidence that he has not recklessly disregarded Mr. Robinson's serious medical needs.

Mr. Robinson disputes that his vision is 20/200 and claims his vision remains blurry even with his new glasses.  ECF No. 36 at 2.  He requests that this court appoint counsel[9] to represent him and require Dr. Goodman to order assistive technology "such as portable video magnifier" so that he can read small print.  *Id*. at 3.  Defendants oppose Mr. Robinson's motion and explain that an order for a magnifier was placed for Mr. Robinson but it was deemed a security threat by correctional staff and medical staff cannot override such a decision.  ECF No. 38-1 at 3, ¶ 10 (Decl. Asresahegn Getachew, M.D.).  Mr. Robinson's claim that his newly issued eyeglasses (*see id*. at ¶ 7) do not correct his blurry vision will be addressed by an optometrist when COVID-19 restrictions on such visits are lifted.  *Id*. at ¶ 9.

B.    Race Discrimination

Mr. Robinson alleges that Dr. Goodman's failure to honor an order issued by Dr. Summerville requiring removal of his cataracts and a surgical eye-lift is due to Dr. Goodman's discrimination against Mr. Robinson on the basis of his race.  Mr. Robinson also implies that other

---

[9]    He also cites the limited movement put into place at WCI as a result of the COVID-19 pandemic as cause for an appointment of counsel and to provide him with assistive devices.  *Id*. at 4.

medical care providers are also engaged in discriminatory behavior when they have declined to give him the care he believes he needs.

A claim that medical services are denied on the basis of race is actionable. *See Henry v. Van Cleve*, 469 F.2d 687 (5th Cir. 1972) (recognizing prisoners' right to be free from race discrimination).  Apart from Mr. Robinson's conclusory allegation that he is denied the care of choice because of his race, there is no evidence of a racial animus on the part of any of the named Defendants in their decisions regarding his care.  *See Battle v. Davis*, 1994 WL 249480 (4th Cir. 1994) (remanding for consideration of race discrimination claim where Programming Director said if she could she would make "every black man with a life sentence serve every day of it"), *see also Hollingsworth v. Wagoner*, 1990 WL 187125, *2 (4th Cir. 1990) ("actions, which deviate from prison policies and suggest arbitrary action, combined with . . . allegations of racially discriminatory remarks . . . could allow a factfinder to infer that the job assignments and changes were at least partially motivated by a racially discriminatory purpose.").  Dr. Goodman readily admits that surgery for floaters, cataracts, or glaucoma is sometimes warranted, but the risks of those procedures were not warranted for Mr. Robinson's particular set of symptoms where a new eyeglass prescription may address the problem without surgery.  Given the serious risks involved with the eye surgery Mr. Robinson is demanding, Dr. Goodman's decision does not appear to be arbitrary, motivated by race discrimination, or the product of deliberate indifference to Mr. Robinson's serious medical needs.  Mr. Robinson's reliance on the fact that two White inmates received the surgery does not establish any merit to his claim; there is no other evidence that the two inmates cited shared the exact same symptoms as Mr. Robinson.  Nor is there any evidence that race played a role in the decision to approve the surgery for the other two inmates.

Mr. Robinson also mentions Title VI of the Civil Rights Act in connection with his discrimination claim.  He alleges that the discrimination against him is based on his race and national origin.  Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d *et seq.*) prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance.  29 U.S.C. § 794a(a)(2).  Title VI prohibits intentional discrimination.  *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).  Mr. Robinson's conclusory allegation that other inmates receive better medical care fails to allege a viable claim under Title VI and must be dismissed.

C.    Retaliation

To the extent that Mr. Robinson raises a claim that Defendants denied him medical care out of retaliation for his prior complaints, the claim fails.  Conclusory claims of retaliation do not state a constitutional claim.  "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."  *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).  Mr. Robinson offers no objective facts to support a claim that the requests he made were denied because of prior lawsuits or administrative remedies.  The record evidence establishes that the decisions made were based on medical concerns without reference to Mr. Robinson's litigiousness.

CONCLUSION

Defendants are entitled to summary judgment in their favor on all claims raised by Mr. Robinson.  A separate Order follows.


January 11, 2021                                                    /s/
                                                    DEBORAH K. CHASANOW
                                                    United States District Judge